In accordance with the Court's memorandum filed herein this date,

IT IS HEREBY ORDERED that the motion to dismiss Count I of plaintiff's complaint filed by Ralston Purina Company and Van Camp Seafood Company, Inc. be and it is denied.

IT IS FURTHER ORDERED that the motion to dismiss Count I filed by Deltown Chemurgic Corporation be and it is denied.

IT IS FURTHER ORDERED that the motion to dismiss Count III filed by Deltown Chemurgic Corporation be and it is denied.

IT IS FURTHER ORDERED that the motion to dismiss Counts VI and VIII filed by Deltown Chemurgic Corporation be and it is denied.

IT IS FURTHER ORDERED that the motion to dismiss Counts II, IV, IV (sic), VII and IX and the entire complaint against it filed by Deltown Chemurgic Corporation be and it is denied.

IT IS FURTHER ORDERED that the motion for partial summary judgment to dismiss Count VIII filed by Deltown Chemurgic Corporation be and it is denied.

**FORTUNE SOUTHFIELD COMPANY, a Missouri General Partnership, Plaintiff,**

v.

**The KROGER CO., a Corporation, Defendant/Third Party Plaintiff,**

v.

**SCHNUCK MARKETS, INC., Third Party Defendant.**

No. 87–2031 C (5).

United States District Court, E.D. Missouri, E.D.

June 29, 1990.

**730**

Michael D. O'Keefe, Thompson and Mitchell, St. Louis, Mo., for plaintiff.

John P. Emde, St. Louis, Mo., for defendant/third party plaintiff.

Roger Edgar, St. Louis, Mo., for third party defendant.

## MEMORANDUM

LIMBAUGH, District Judge.

Third-party plaintiff The Kroger Company ("Kroger") initiated this third-party complaint against third-party defendant Schnuck Markets, Incorporated ("Schnucks"). Kroger alleges that Schnucks breached the terms of a Lease Assignment and Assumption Agreement entered into between Kroger and Schnucks. Schnucks counterclaimed alleging that Kroger breached the terms of the Agreement, and seeks attorneys fees under the contract.

The third-party main claim and counterclaim were tried before this Court sitting without a jury. This Court, having considered the pleadings, the testimony of the witnesses, the documents in evidence and the stipulation of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

Kroger is an Ohio Corporation with its principal place of business in Cincinnati, Ohio. Schnucks is a Missouri Corporation with its principal place of business in St. Louis County, Missouri. Fortune Southfield Company ("Fortune Southfield") is a Missouri partnership.

Fortune Southfield is a multi-faceted partnership that is a real estate and business promoter. It was promoting a shopping center on South Lindbergh in St. Louis County, and was interested in having a Kroger store be the anchor. With that in mind, Fortune Southfield entered into a written agreement with Kroger dated March 31, 1986. The Lease Agreement was a combination contract which embraced a construction agreement and a lease. Under the Lease Agreement, Fortune Southfield agreed to construct a store for Kroger according to plans and specifications prepared by Kroger. Fortune Southfield agreed to complete construction on the store by the 1986 Christmas holiday season. Kroger would then lease the premises from Fortune Southfield for a twenty-year period.

The Agreement provided that, in addition to fixed and percentage rental payments payable over the term of the leases, Kroger was obligated to make a one time payment to Fortune Southfield if the costs of construction of the store exceeded $1,996,-160.00. The construction costs in excess of $1,996,160.00 are referred to as "Excess Tenant Building Costs" in the Lease Agreement. Kroger promised to pay the Excess Tenant Building Costs ("Excess Costs") in the following manner:

a) If the costs exceeded $1,996,160 but did not exceed $2,095,968, Kroger obligated itself to pay the difference or $99,-808 without qualification.

b) If the costs exceeded $2,095,968, Kroger obligated itself to pay the excess over that amount only if it had previously approved the construction cost estimates furnished by Fortune Southfield reflecting anticipated construction costs over and above $2,095,968.

In addition to the requirement to reimburse Fortune Southfield for Excess Tenant Building Costs, Kroger obligated itself to pay for any "Change Orders" it might initiate or agree to during the construction period. Construction of the Kroger Store began in March 1986, and was completed in the fall of that year. The cost of construction for the building in accordance with the plans exceeded $1,996,160. Fortune Southfield, however, did not compile its cost figures until early 1987.

During the construction process, Kroger made its election to leave the St. Louis area. In so doing, Kroger abandoned forty-five or more stores in the St. Louis and East St. Louis areas. Kroger approached Schnucks in an attempt to have Schnucks buy all of the stores. Schnucks refused at that time as the parties could not agree on a price. Kroger then attempted to sell its stores to other companies, but was unable to do so. Kroger finally sold its stores on a bid basis through a store-by-store auction.

By a Purchase Agreement dated November 15, 1986, Schnucks bought eight of the stores. One of the eight stores was the store then under construction by Fortune Southfield for Kroger. The Purchase Agreement related to all eight stores. However, in conjunction with the closing on each of the leased stores, a separate written Lease Assignment and Assumption Agreement was executed. Thus, Kroger assigned its interest in the Lease Agreement with Fortune Southfield to Schnucks in a Lease Assignment and Assumption Agreement dated December 22, 1986.

There is conflicting testimony whether the subject of construction cost overruns and change orders had been discussed during the course of the negotiations that took place between Schnucks and Kroger. Mr. Craig Schnuck, President of Schnucks, testified that the subject was addressed during numerous telephone conversations between himself and Mr. Arthur Juergens, Kroger's principal negotiator and senior executive vice-president. Mr. Schnuck maintains that there was an oral agreement between Juergens and Schnuck to the effect that Schnucks would receive all of the eight stores, including the new one in question, fully equipped and paid for. If Schnucks made modifications to suit its taste, that would be at Schnucks' cost. Otherwise, the total purchase price would include the store in question, fully paid for. Mr. Schnuck testified that Juergens stated that he understood and agreed that this was the case.

Mr. Schnuck further stated in support of his position that prior to the execution of the formal Purchase Agreement and the Lease Assignment, the parties consummated documents to effect the transfers. Initially, Kroger's attorneys prepared a "Memorandum of Understanding" after Schnucks was the successful bidder for the eight stores. Craig Schnuck received a draft of this document from Kroger. The draft provided in paragraph 3 that:

"3. Schnuck's will purchase all tenancy rights, leasehold improvements, furniture, fixtures and equipment located in one (1) leased store currently under construction. *In the event the cost of any fixtures or equipment actually installed by Kroger in such store or the store described in paragraph 2 above differs from the amount contemplated by Kroger, the purchase price set forth in paragraph 4 below shall be adjusted by such amount.*" [Emphasis Added].

Following receipt of the draft, Mr. Schnuck called Mr. Juergens. Schnuck told Juergens that paragraph three did not reflect the deal that had been negotiated because Schnucks was to receive the stores fully paid for with the cost certain. Schnucks had not agreed to be responsible for any construction cost overruns or Kroger-generated change orders. Schnucks was to take over leases for fixed rental rates identified in the leases and have no other further obligations to anyone. Schnuck further testified that Kroger had agreed that it would complete and pay for the stores and would purchase all equipment required to fixture the stores. Only if Schnucks made any changes in the stores would the costs of those changes be at Schnucks' expense. Schnuck stated that

Juergens agreed with him and, accordingly, Kroger deleted the language in dispute. The executed memorandum of understanding was signed by Juergens' successor and Craig Schnuck on October 15, 1986. The paragraph appearing in the final executed Memorandum of Understanding reads that:

3. Schnuck's will purchase all tenancy rights, leasehold improvements, furniture, fixtures and equipment located in one (1) leased store currently under construction identified on Exhibit A as S–938.

Mr. Juergens testified that he did not recall any negotiations with Mr. Schnuck regarding excess costs or change order costs. Bruce Gack, house counsel for Kroger, testified that it was his interpretation that Schnucks was obligated for all costs incurred after the closing date with Schnucks, which was December 22, 1986.

The Court finds the testimony of Mr. Craig Schnuck to more accurately reflect the state of events that negotiations did in fact take place between the parties regarding excess costs and change order costs. The Court is particularly persuaded to reach this conclusion in light of the corroborating evidence regarding the change in the draft of the documents. Furthermore, Mr. Juergens never stated that these events did not occur. He merely stated that he did not recall whether they occurred or not.

The Lease Assignment and Assumption Agreement for the Fortune Southfield Store provides "Schnucks [1] hereby assumes and agrees to perform and observe all of the obligations of Kroger under the Lease [with Fortune Southfield], including all monetary obligations thereunder which accrue from and after this date [December 22, 1986]."

The Purchase Agreement between Schnucks and Kroger, dated November 15, 1986, also contains a number of provisions pertinent to the resolution of the dispute between Schnucks and Kroger. The paragraph Kroger relies most heavily upon in

support of its position is paragraph 3 of that document. In paragraph 3 it states that:

Schnucks shall assume all of the obligations of Kroger under [Kroger's lease with Fortune Southfield] accruing on and after the Closing Date.

The Purchase Agreement further provides in paragraph 13 and with specific reference to the Fortune Southfield Store then under construction that:

Kroger shall not, without the consent of Schnucks, make any changes to the plans and specifications for or construction of the New Store. From and after the date hereof, Schnucks shall have the right to authorize Fortune Southfield or contractor for the New Store to make changes in the construction, plans and specifications for the New Store, provided that, if, as a result of such changes, the cost of construction for the [Store] to be paid by Kroger is increased over the cost of construction to be paid by Kroger as of the date of this Agreement, such increase shall be paid by Schnucks.

In Paragraph 8, Kroger and Schnucks agreed that:

Schnucks shall not assume and shall not be liable for any obligations or liabilities of any kind whatsoever of Kroger other than those expressly assumed hereunder. Kroger agrees to indemnify and hold Schnucks harmless against any loss, cost, liability or expense, including cost and expense of litigation and reasonable attorneys fees, arising out of ... Kroger's obligations as tenant under ... [the Lease with Fortune Southfield] accruing prior to the ... Closing Date as to the [Fortune Southfield] Store ... or by reason of the incorrectness or breach by Kroger of any of its representations, warranties and agreements set forth in this agreement.

Finally, the Purchase Agreement contains the following representations, warranties and covenants by Kroger in paragraph 9:

---

1. The proper names of the parties have been substituted here and elsewhere in this opinion for terms such as "Buyer," "Seller," "Assignor," and so on.

Kroger's interest as Lessee in its Lease-holds [under its lease with Fortune Southfield] will be free and clear of all ... liens or encumbrances created by Kroger. Kroger has delivered to Schnucks true and complete copies of the Lease and all supplemental agreements thereto and there are no oral agreements or amendments with respect thereto.

Once Fortune Southfield determined its figures for the Kroger Store, it rendered its bill to Kroger in February 1987. The bill was for excess costs and change order costs. Kroger refused to pay the bill alleging that even if the money was due and owing, which Kroger challenged, Schnucks was responsible for the costs because Schnucks had assumed the costs at the closing on December 22, 1986. On July 23, 1987, Kroger forwarded the February billing to Schnucks, noting that pursuant to the Lease Assignment and Assumption Agreement the amounts claimed by Fortune Southfield, if due and owing, were the responsibility of Schnucks.

After Kroger refused to pay the bill, Fortune Southfield brought this action against Kroger in November 1987. Fortune Southfield sought recovery of Excess Tenant Building Costs in Counts I and II, Kroger "Change Order Costs" in Count III and Count IV was for Account Stated.

Kroger then initiated this third-party complaint against Schnucks seeking indemnity for Fortune Southfield's claims. The third-party complaint alleged that under the terms of the Purchase Agreement and Lease Assignment between Kroger and Schnucks, that Schnucks assumed all obligations of Kroger under the latter's Lease Agreement with Fortune Southfield with the consequence that if Fortune Southfield recovers judgment against Kroger for excess tenant costs and change order costs, then Kroger is entitled to indemnity. Schnucks counterclaimed against Kroger seeking indemnification on the ground that the obligation to pay for the store remained the obligation of Kroger and that Kroger's failure to pay indebtedness due and owing to Fortune Southfield has damaged Schnucks because Schnucks has paid costs and attorneys fees to defend Kroger's third party claim. Schnucks' counterclaim seeks recovery of these fees and costs.

The claims asserted by Fortune Southfield against Kroger were tried to a jury from April 10 to April 18, 1989. Kroger's third party claim, as well as Schnucks' counter claims against Kroger were reserved for trial before the Court without a jury on September 12, 1989.

At the jury trial of plaintiff's claim against Kroger, the jury found in favor of Fortune Southfield. It awarded Fortune Southfield $99,808.00 on Count I finding that there were Excess Tenant Building Costs. It also found in favor of Fortune Southfield on Count III in the amount of $108,257.50 for change order costs. The jury finally found in favor of Fortune Southfield on Count II and assessed its damages at $1.00. The jury awarded reasonable attorneys fees in the amount of $37,000.00. The Court entered a directed verdict on Count IV. Judgment was entered accordingly on April 18, 1989.

## CONCLUSIONS OF LAW

This Court has jurisdiction over this matter pursuant to Title 28 U.S.C. § 1332 in that the matter in controversy exceeds, exclusive of interest and costs, the requisite jurisdictional amount, and there is complete diversity of citizenship between the parties. Thus, the substantive law of Missouri applies under the circumstances of this case.

The sole issue to be resolved by this Court is simply to determine which party is responsible for the Excess Tenant Building Costs and Change Order Costs incurred by Fortune Southfield under the Purchase Agreement dated November 15, 1986. More particularly, the issue is whether the obligation to Fortune Southfield for excess costs and change order costs "accrued" prior to December 22, 1986, the date of the assignment. The clause relied upon by Kroger in support of its position is paragraph 3 of the Purchase Agreement which provides that Schnucks shall assume all of the obligations of Kroger under Kroger's lease with Fortune Southfield accruing on and after the closing date. Kroger con-

tends that although the work on the store in question was completed prior to the closing date, the obligation to pay for the completed work did not accrue until February 1987, when Fortune Southfield first submitted its bill to Kroger for construction costs. Schnucks argues that the obligation to pay accrued prior to the closing date when the work was completed.

The beginning point in any contract dispute resolution is the contract itself. The first issue to resolve is whether the contract is ambiguous. The language of a contract is deemed ambiguous where it is susceptible to more than one meaning and where reasonable men may fairly differ as to what the meaning is. *Ridley v. Newsome*, 754 S.W.2d 912, 914 (Mo.App.1988). An ambiguity does not arise from a contract merely because the parties to that contract do not agree on how it is to be construed. *Hill v. McDonald's Corp.*, 709 S.W.2d 169, 170 (Mo.App.1986). In determining whether an ambiguity exists, the whole instrument must be considered. *Wickham v. Wickham*, 750 S.W.2d 544, 546 (Mo.App.1988). Furthermore, in examining a contract for ambiguity, the ordinary and casual meaning of the words is considered. *Ridley*, 754 S.W.2d at 915.

The cardinal rule permeating the entire field of construction is that the court must ascertain the intention of the parties and then give effect to that intent. *Tri–Lakes Newspapers, Inc. v. Logan*, 713 S.W.2d 891, 893 (Mo.App.1986). Where there is no ambiguity in the contract, the intention of the parties is to be gathered from it and it alone. A court will not resort to construction where the intent of the parties is expressed in clear and unambiguous language, for there is nothing to construe. *Wickham v. Wickham*, 750 S.W.2d 544, 546 (Mo.App.1988).

Although the intention of the parties of an unambiguous contract is to be gathered solely from the contract, the meaning of an *ambiguous* contract is to be determined in regard to extrinsic circumstances. *Ridley*, 754 S.W.2d at 915. To give construction to an ambiguous contract which will reflect the parties' intent, the court may consider the entire contract, subsidiary agreements, the relationship of the parties, the subject matter of the contract, the practical construction the parties themselves have placed on the contract, by their acts and deeds, and any other external circumstances which shed light on the intent of the parties. *Tri–Lakes*, 713 S.W.2d at 893; *Mal Spinrad of St. Louis, Inc. v. Karman, Inc.*, 690 S.W.2d 460, 463 (Mo.App.1985).

Although the intent of the parties as it existed at the time of execution may be difficult to ascertain, it can be inferred from their acts and words preceding, attending and subsequent to the execution of the instrument. *Tri–Lakes*, 713 S.W.2d at 894; *Shell v. Shell*, 658 S.W.2d 439, 444 (Mo.App.1982). Another rule of construction followed by the courts in ascertaining the intention of the parties is to look for a reasonable and natural construction of their agreement. An interpretation which evolves unreasonable results when a probable and reasonable construction can be adopted will be rejected. *Tri–Lakes*, 713 S.W.2d at 894.

The initial determination for this Court is to decide whether the Purchase Agreement is ambiguous. The fact that Kroger and Schnucks do not agree on how the contract is to be construed does not necessarily mean that an ambiguity exists. *Hill*, 709 S.W.2d at 170. In this instance, however, the Court finds that an ambiguity does exist, because the language of the contract is susceptible to both parties' interpretations, and reasonable men may indeed differ as to what the meaning of the Purchase Agreement is. *Ridley*, 754 S.W.2d at 914.

Having determined that the contract is ambiguous, the Court must ascertain the intentions of the parties and then give effect to that intent. *Tri–Lakes*, 713 S.W.2d at 893. The Court finds upon consideration of extrinsic circumstances that the parties intended Kroger to be responsible for the Excess Tenant Building Costs and Change Order Costs.

In reaching this decision, the Court finds that the acts and words of the parties preceding and attending the execution of

the instrument to be most persuasive. *Tri–Lakes,* 713 S.W.2d at 894. Of significant importance are the negotiations surrounding the drafting of the memorandum of understanding. The parties discussed the subject of construction cost overruns and change order costs. Kroger drafted the memorandum of understanding for Craig Schnuck. The memorandum included language to the effect that if the costs to Kroger for completing the store exceeded what the parties had agreed upon for the purchase price, then the purchase price would be adjusted upward accordingly. Craig Schnuck objected to that language because it was made clear in negotiations that Schnucks had not agreed to be responsible for any construction cost overruns or Kroger-generated change orders. Significantly, Kroger then deleted that language from the amended memorandum of understanding to reflect the parties' intentions. Clearly, it was never the intention of the parties that Schnucks would assume the obligations generated by Kroger. Schnucks intended only to pay a sum certain for the store which was to be fully fixtured and completed.

Not only do the prior acts of the parties support this interpretation, but the Purchase Agreement itself also supports this conclusion. Paragraph 3 of the Purchase Agreement provides that Schnucks shall assume all of the obligations of Kroger under Kroger's lease with Fortune Southfield "accruing on and after the closing date." According to Webster's Unabridged Third New International Dictionary, "accrue" means "to come into existence as an enforceable claim: vest as a right...." There are few decisions construing the term "accrue" in the context of contracts. The State of Missouri has interpreted the term in *In re North's Estate,* 320 S.W.2d 597, 600 (Mo.App.1959). In *North,* the court held that a statute which entitled a life tenant to rent which shall have "accrued" before his death did not entitle the life tenant's executor to any part of the crop rent where the life tenant died prior to the harvest. *Id.* The court stated that the statute did not entitle the life tenant's estate to any part of "unaccrued rent in the form of growing crops or not yet due cash rent...." *Id.* at 601. Thus, in accordance with Webster's definition, the court concluded that "accrued" means due and payable, so as to be an enforceable right.

In accordance with this definition, it is clear that Kroger is obligated to pay for the excess costs and change order costs. All construction work done on Kroger's behalf by Fortune Southfield had been completed prior to the time Kroger assigned its interest and its lease to Schnucks. At the time of assignment, the only thing that remained was for Fortune Southfield to submit a bill to Kroger. It is clear that when Fortune Southfield completed the work on the store prior to the closing, it had an enforceable right to be paid for that work. This is so despite the fact that Fortune Southfield did not physically bill Kroger for the costs until after the closing date.

Paragraph 13 of the Purchase Agreement provides that after the signing of the Purchase Agreement, Schnucks has the right to make changes in the construction, plans and specifications for the store. However, if as a result of these changes the cost to be paid by Kroger is increased then the increase shall be paid by Schnucks. The clear import of this provision was to place responsibility for all costs of the store on Kroger except for the costs, if any, that might be incurred as a result of Schnucks' change orders. Clearly, Paragraph 13 is consistent with the intent of the parties, as expressed in their negotiations. Schnuck's purchase price required Kroger to deliver a fully equipped and completed building that was fully paid for.

Kroger's warranty and covenant in paragraph 8 of the Purchase Agreement that its interest as Lessee would be free of "encumbrances created by Kroger" is further evidence that the parties intended that Kroger alone would remain obligated to pay for the costs of construction as the existence of valid but unpaid bills for labor and materials incident to construction would be an encumbrance upon the building and leasehold interest of Kroger.

Finally, the reasonable and natural construction of the agreement supports this interpretation of the parties' intentions. *Tri–Lakes*, 713 S.W.2d at 894. It simply does not seem reasonable that Schnucks would agree to pay for any expenses incurred by Kroger for the building of this site caused and incurred by Kroger, simply because the bill arrived after the closing date. The more reasonable interpretation of the contract is that Kroger was responsible for the excess tenant costs and change order costs caused by Kroger prior to the closing date, and Schnucks would be obligated to pay those costs created by Schnucks' actions during the construction.

For all of these reasons, the Court finds that Kroger is to be obligated to pay for the Excess Tenant Costs and Change Order Costs which the jury found to be due and owing to Fortune Southfield for the construction of the store. Kroger's obligation to pay Fortune Southfield for construction costs overruns and Kroger-generated change orders accrued prior to December 22, 1986 within the meaning of the Lease Assignment because the work giving rise to Fortune Southfield's claim had taken place before the lease was assigned to Schnucks. Furthermore, it was the intention of the parties upon entering the contract that Schnucks was paying a sum certain for a fully equipped, completed and paid for store. Schnucks was only to be obligated for any expenses created through the actions of Schnucks itself which were in addition to those incurred by Kroger in completing and fully equipping the store.

Thus, in accordance with the findings of fact and conclusions of law, the Court finds that judgment should be entered in favor of Schnucks and against Kroger on Kroger's third-party complaint. Further, judgment should be entered in favor of Schnucks and against Kroger on Schnuck's third-party counterclaim. Schnucks shall submit its claims for attorneys' fees incurred in the defense of this action pursuant to Local Rule 30 and in accordance with the Court order made prior to the trial of the third party action. Judgment will be entered accordingly.